IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DOROTHY V. OLSEN,

                Plaintiff,                            CV-08-6030-ST

      v.                                          FINDINGS AND
                                                      RECOMMENDATION

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                Defendant.

STEWART, Magistrate Judge:

## INTRODUCTION

      Plaintiff, Dorothy Olsen ("Olsen"), seeks judicial review of the Social Security Commissioner's final decision denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("the Act"), 42 USC §§ 401-34, 1381-1383f. This court has jurisdiction under 42 USC §§ 405(g) and 421(d). For the reasons set forth below, the Commissioner's decision should be AFFIRMED.

1 - FINDINGS AND RECOMMENDATION

## BACKGROUND

Olsen was born in August 1968 and was age 38 at the time of the ALJ's decision. Tr. 17-27, 234.[1] She has a high school education and was insured for SSI benefits through December 31, 2006. Tr. 19, 234-35. Her work history includes work in a deli and as a cashier between 1998 and mid-2001 and as a hotel housekeeper between July and September 2001. Tr. 82.

Olsen alleges that her disability began on September 15, 2001, based on a combination of physical and mental impairments, including depression, severe anxiety disorder, and lower back and right leg pain. Tr. 70-72, 81-82.

## PROCEDURAL HISTORY

Olsen applied for DIB and SSI, with a protective filing date of July 29, 2004.[2] Tr. 17, 70-80, 223-25. Her applications were denied initially and upon reconsideration. Tr. 28, 30-32, 214-222. Olsen requested a hearing before an ALJ which was held on May 3, 2007. Tr. 29, 229-280. The ALJ issued his decision on May 16, 2007, finding her not disabled. Tr. 17-27. Olsen timely appealed the ALJ's decision to the Appeals Council which denied her request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 6-9; 20 CFR § 404.981.

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of no less than 12

---

[1] Citations to "Tr." are to the Administrative Record filed May 23, 2008 (docket #8).

[2] The Commissioner previously denied two prior applications for DIB and SSI filed in 2002 and 2003, but declined to reopen or revise those prior initial determinations in the context of the decision on Olsen's 2004 application that is the subject of this case. Tr. 18.

months[.]" 42 USC § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995), *cert denied*, 517 US 1122 (1996) (citations omitted). The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 CFR §§ 404.1520, 416.920. Below is a summary of the five steps, which also are described in *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999):

At step one, the Commissioner determines whether the claimant is engaged in substantial gainful activity. 20 CFR §§ 404.1520(b), 416.920(b). If so, then the claimant is not disabled.

At step two, the Commissioner determines whether the claimant has "a severe medically determinable physical or mental impairment." 20 CFR §§ 404.1520(c), 416.920(c). If not, then the claimant is not disabled.

At step three, the Commissioner determines whether the severe impairment "meets or equals" one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 ("Listing of Impairments"). 20 CFR §§ 404.1520(d), 416.920(d). If so, then the claimant is disabled.

If the analysis proceeds beyond step three, the Commissioner must determine the claimant's residual functional capacity ("RFC"). The RFC is an assessment of work-related activities the claimant can perform on a regular and continuing basis, despite the limitations imposed by the impairments. 20 CFR §§ 404.1545(a), 416.920(e), 416.945; Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

Using the RFC, the Commissioner determines at step four whether the claimant can perform past relevant work. 20 CFR §§ 404.1520(e), 416.920(e). If so, then the claimant is not disabled.

3 - FINDINGS AND RECOMMENDATION

Finally, at step five, the Commissioner determines whether the claimant is able to perform other work in the national economy. 20 CFR §§ 404.1520(f), 404.1566, 416.920(f). If not, then the claimant is disabled.

At steps one through four, the burden of proof is on the claimant. *Tackett*, 180 F3d at 1098. However, at step five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy. *Id.*

## ALJ'S FINDINGS

At steps one and two, the ALJ found that Olsen suffered from a medically determinable severe combination of impairments, including obesity, carpal tunnel syndrome, probable right biceps tendonitis, depressive/adjustment disorder, and avoidant/dependent personality traits. Tr. 20. However, the ALJ found no medically determinable back impairment and at step three concluded that the medically determinable impairments did not meet or equal one of those listed in the Listing of Impairments. Tr. 20-21.

The ALJ found that Olsen retained an RFC to perform light work (lifting and/or carrying 25 pounds occasionally and 20 pounds frequently), to stand or walk at least two hours and sit about six hours with the opportunity to periodically alternate sitting and standing, to perform limited pushing or pulling in her upper extremities, to occasionally climb, balance, kneel, crouch, crawl, or stoop, but only occasionally reach and handle (gross manipulation). Tr. 21. Mentally she was precluded from work in public services or under close supervision and should have only limited interactions with coworkers. Tr. 21, 26. Based upon the testimony of a vocational expert ("VE"), the ALJ determined at step four that Olsen's RFC precluded her from returning to her past relevant work. Tr. 25.

At step five, the ALJ found that there existed a significant number of jobs in the national economy that Olsen could perform, including unskilled light exertion jobs as a laminating machine operator (DOT 569.686-046)[3] or a bakery worker (DOT 524.687-022) and the unskilled sedentary job of a surveillance system monitor (DOT 379.367-010).  Tr. 26.  Therefore, the ALJ determined that Olsen was not disabled at any time through the date of his decision.

## CLAIMANT'S ARGUMENTS

Olsen argues that the ALJ erred by improperly rejecting the testimony of a lay witness, failing to consider the combined effect of all her impairments, and relying on faulty testimony from the VE in determining that substantial jobs existed in the national economy which she is able to perform.  Those arguments do not withstand scrutiny.

## FINDINGS

### I. Rejection of Testimony and Failure to Consider Combined Impact of Impairments

Olsen's first two arguments center on the ALJ's rejection of testimony related to alleged lower back spasms and mental impairments.  Essentially, Olsen challenges the ALJ's decision to discredit her testimony and the identical testimony of her mother, Joan Peterson ("Peterson"), and friend, Rose Houk ("Houk"), concerning these alleged impairments and the ALJ's related failure to incorporate those limitations into her RFC.

///

///

---

[3] The Secretary uses the *Dictionary of Occupational Titles* ("*DOT*"), "in determining the skill level of a claimant's past work, and in evaluating whether the claimant is able to perform other work in the national economy."  *Terry v. Sullivan*, 903 F2d 1273, 1276 (9th Cir 1990), citing *DOT*, U.S. Dep't of Labor (4th ed. 1977).  In *Villa v. Heckler*, 797 F2d 794, 798 (9th Cir 1986), the court noted that "[t]he Secretary may rely on the general job categories of the [DOT], with its supplementary *Selected Characteristics*, as presumptively applicable to a claimant's prior work."

5 - FINDINGS AND RECOMMENDATION

### A. Testimony Regarding Lower Back Spasms and Panic Attacks

At the hearing before the ALJ, Olsen related the onset of her back problems to being repeatedly punched in the lower back in 1991, noting that her lower back problems have worsened since then. Tr. 239. Olsen testified that she cannot stand for very long without her ankles and feet swelling and her legs giving out underneath her. Tr. 238-39. She estimated that she could sit for a maximum of 15 minutes without laying down or doing something else. Tr. 238. She cannot lift anything heavier than about 10 pounds because it causes her back to start to twitch, makes her leg go numb, and makes her fall down. Tr. 239-40. She experiences daily "spasms," which she attempts to stop by applying pressure with her hand to her lower back. Tr. 241, 250-51.

Olsen testified that, in the two weeks prior to the hearing, she had fallen down to the ground seven times as a result of such spasms, including once in the lobby of the building where the hearing before the ALJ was held. Tr. 251-52. The spasms start in the center of her back, then travel up into both her shoulders and are brought on by lifting too much or moving around too much. Tr. 249-50. Olsen uses a cane when walking and a motorized cart when grocery shopping because she is unable to walk through the store and fears falling down. Tr. 247, 251. She had given up her drivers' license because of the back spasms, fearing that she might cause an accident when her spasms cause her leg to go numb. Tr. 248. She relies on her mother for transportation. Tr. 248-49.

With regard to her daily activities, Olsen testified that she lives with her parents and her youngest daughter who is home-schooled. Tr. 245. Olsen spends about 15 minutes per day online to obtain homework assignments for her daughter. Tr. 246. Other than that, Olsen lies

6 - FINDINGS AND RECOMMENDATION

down in her bed or reclines in a chair reading or crocheting and trying to keep her back stretched out and relaxed. Tr. 247. She does not cook or do housework. *Id*.

Olsen's mother, Peterson, testified that Olsen has spasms that cause pain to travel down her leg and make her fall to the floor. Tr. 261. Peterson always accompanies Olsen when she goes out of her home because Olsen does not like strangers having to help her up when she falls and because Olsen panics in large crowds and when her mother or daughter are out of her sight for more than a few minutes. Tr. 261-62, 265-66. Peterson supported Olsen's statements that she rides in mechanized carts at grocery stores, has fallen about seven times in the past two weeks, cannot sit long without becoming too stiff to get up, and also cannot stand long without falling down. Tr. 262. Peterson holds her hands on Olsen's back as often as four or five times a day in order to help stop the spasms that Olsen experiences. *Id*. Peterson bought several items for her home to help Olsen, including a tall chair in the kitchen, a taller bedframe, plastic dishes, and a handicap-height toilet. Tr. 264-65.

Houk, who has been Olsen's friend for about six years and sees her twice a week, also testified at the hearing. Houk's testimony essentially repeated Olsen's testimony, corroborating Olsen's statements with regard to giving up her driver's license (Tr. 270), walking slowly and using a motorized cart while grocery shopping (Tr. 269-70), experiencing back "spasms" which can make her fall to the floor (*id*), and having anxiety attacks that cause Olsen to become "scared" or "all over shaky" if she has to be by herself for more than a few minutes (Tr. 270-71).

///

///

7 - FINDINGS AND RECOMMENDATION

///

Case 3:08-cv-06030-ST    Document 11    Filed 02/12/09    Page 8 of 13

8 - FINDINGS AND RECOMMENDATION

### B. Legal Standards

If a claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged and no affirmative evidence of malingering exists, the ALJ must assess the credibility of the claimant regarding the severity of symptoms. *Carmickle v. Comm'r*, 533 F3d 1155, 1160 (9th Cir 2008); *Smolen v. Chater*, 80 F3d 1273, 1281-82 (9th Cir 1996). The ALJ may discredit a claimant's testimony regarding the severity of symptoms by providing clear and convincing reasons for doing so. *Dodrill v. Shalala*, 12 F3d 915, 918 (9th Cir 1993); *Smolen*, 80 F3d at 1283.

Friends and family members and others in a position to observe a claimant's symptoms and daily activities are competent to testify as to the claimant's condition. *Dodrill,* 12 F3d at 918. Such testimony cannot be disregarded without comment. *Nguyen v. Chater*, 100 F3d 1462, 1467 (9th Cir 1996). If the ALJ wishes to discount lay witness testimony, he must give reasons that are germane to the witness. *Id.*

### C. No Error to Refuse to Incorporate Back and Panic Attack Impairments

The ALJ erred by not discussing Houk's testimony. However, that error is harmless. As noted above, Houk's testimony repeated Olsen's own testimony nearly word-for-word. The ALJ credited several of Olsen's allegations as to impairments with very little supporting evidence in the record. For example, the ALJ found that Olsen's tendonitis and carpal tunnel syndrome were not objectively established and diagnosed until Dr. Nolan's evaluation in January 2007. Tr. 23. The ALJ nevertheless favorably construed the medical evidence and included those as "severe" limitations. *Id.* Similarly, the ALJ noted a lack of historical information indicating mental impairments, noting that Olsen had participated in no mental health counseling, had no history of

inpatient hospitalization, and responded well to medications with respect to her depression. Tr. 24. However, he likewise credited the September 17, 2004 findings of Dr. James Wahl that Olsen should not work in public services or be under close supervision, and should have only limited interactions with coworkers. *Id*.

However, the ALJ drew the line at Olsen's alleged back impairments due to the lack of medical evidence and the lack of "enough objective evidence to make her allegation of inability to walk due to pain and spasm readily believable." Tr. 21. The ALJ supported this conclusion with a detailed discussion of the back-related medical evidence and of Olsen's alleged symptoms and restrictions attributable to her back problems, including her allegations of muscle spasms and use of a cane. Tr. 20. The ALJ also gave a detailed explanation as to why he found the testimony of Olsen and her mother to be not credible (Tr. 24-25) which Olsen does not directly challenge. Based on that explanation, the ALJ flatly rejected limitations related to an alleged back impairment, except back pain that might be expected as a result of her obesity:

> [T]he meager objective medical evidence, coupled with the claimant's inconsistencies, fail to establish a medically determinable back impairment. The medical evidence, as discussed above, does support a conclusion that the claimant, in [*sic*] least, is grossly exaggerating her condition and, worst, deliberately malingering.
> \*       \*       \*
> At most, consultative evaluator Dr. Nolan speculated that she may have back pain related to her obesity but he imposed no greater limitations than are allowed for in the above residual functional capacity. In assessing work-related limitations / capabilities, Dr. Nolan included the claimant's obesity. In accepting Dr. Nolan's assessment, the undersigned has also considered and included the claimant's obesity.

Tr. 21, 23.

10 - FINDINGS AND RECOMMENDATION

A review of the ALJ's reasoning and citations to the medical evidence reveals that his evaluation of the evidence and testimony related to Olsen's alleged lower back impairment is fully supported by the record. Because he provided sufficient reasons for discrediting the testimony of Olsen and her mother related to back symptoms, it was not error to refuse to incorporate that testimony (or Houk's testimony to the same effect) into Olsen's RFC.

The ALJ credited Olsen's allegation of mental impairments, including her depressive/adjustment disorder and avoidant/dependent personality traits as part of her "severe" combination of impairments. Tr. 20. The ALJ credited the findings of Dr. Wahl, finding Olsen "mentally capable of working" but precluded from performing public services jobs or being closely supervised and restricted to only limited interaction with coworkers. Tr. 24. In explaining that decision, the ALJ performed a detailed review of the mental health treatment records, noted that Olsen's depression responded well to medication, and included the allegations by Olsen regarding her mental impairments, despite his view that, "given her normal mental status evaluations throughout, good prompt response to medications and a two-year gap of no treatment whatsoever, a much stronger argument can be made that during this period the claimant's mental impairments were 'non-severe.'" *Id*. Again, this conclusion is fully supported by the record. Because the ALJ's decision to reject the testimony regarding an alleged back impairment and to incorporate mental limitations only to the extent endorsed by Dr. Wahl is fully supported by the record, the ALJ did not fail to consider the combined impact of Olsen's impairments.

///

///

11 - FINDINGS AND RECOMMENDATION

## II. Identification of Other Jobs

Olsen also argues that the ALJ erred by identifying jobs which include requirements inconsistent with her RFC. Specifically, she asserts that the laminating machine operator and the bakery worker jobs both include frequent hand use that is inconsistent with her upper extremity limitations. However, even assuming Olsen is correct, the ALJ identified a third position, namely that of a surveillance-system monitor. Although Olsen argues that the VE equivocated on the percentage of those jobs which would require public contact (Tr. 279), the *DOT* description of that job includes no such requirement, instead emphasizing monitoring of closed circuit televisions and making telephone notifications to authorities or repair persons:

> Monitors premises of public transportation terminals to detect crimes or disturbances, using closed circuit television monitors, and notifies authorities by telephone of need for corrective action: Observes television screens that transmit in sequence views of transportation facility sites. Pushes hold button to maintain surveillance of location where incident is developing, and telephones police or other designated agency to notify authorities of location of disruptive activity. Adjusts monitor controls when required to improve reception, and notifies repair service of equipment malfunctions.

*DOT* 379.367-010.

The VE testified that 190 such jobs exist in Oregon, and 47,000 such jobs exist nationally. Tr. 275. Those numbers are sufficient for the ALJ to meet his burden under step five. *Thomas v. Barnhart*, 278 F3d 947, 950 (9th Cir 2002) (1,300 jobs in the state and 622,000 jobs nationally sufficient); *Moncada v. Chater*, 60 F3d 521, 524 (9th Cir 1995) (2,300 jobs in the county and 64,000 nationwide sufficient); *Barker v. Sec'y of Health & Human Servs.*, 882 F2d

1474, 1478-79 (9th Cir 1989) (citing with approval cases from other districts finding even a few hundred jobs sufficient).

## RECOMMENDATION

For the reasons set forth above, the Commissioner's decision should be AFFIRMED.

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due March 3, 2008. If no objections are filed, then the Findings and Recommendation will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district judge and go under advisement.

DATED this 12th day of February, 2009.

/s  Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge

13 - FINDINGS AND RECOMMENDATION